**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| NORTHMOBILETECH LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 11-CV-291 |
| vs. | ) | |
| | ) | Hon. William M. Conley |
| GENERAL GROWTH PROPERTIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**GENERAL GROWTH PROPERTIES, INC.'S BRIEF IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT OF INVALIDITY AND
NON-INFRINGEMENT OF U.S. PATENT NO. 7,805,130**

# TABLE OF CONTENTS

I.     **INTRODUCTION** .................................................................................................. 1

II.     **FACTUAL BACKGROUND** ............................................................................... 2

     A.     General Technology Background ........................................................... 2

     B.     GGP's The Club Mobile App ............................................................... 3

     C.     The Club Mobile App Source Code Versions ...................................... 6

III.     **SUMMARY JUDGMENT LEGAL STANDARDS** .......................................... 6

IV.     **SUMMARY JUDGMENT OF INVALIDITY** ................................................. 7

     A.     Legal Standards .................................................................................... 7

     B.     The Treyz Patent Anticipates Claims 1, 3, 17, and 19 of The '130 Patent. ............. 8

         1.     The Treyz Patent Is Prior Art Under 35 U.S.C. § 102(b) .......... 9

         2.     The Treyz Patent Discloses Each and Every Element of Claims 1, 3, 17, and 19 of the '130 Patent ......................... 9

     C.     The Mehrabani-Farsi Patent Application Anticipates Claims 1, 3, 17, and 19 of the '130 Patent. ........................................................ 25

         1.     The Mehrabani-Farsi Patent Application is Prior Art to the '130 Patent Under 35 U.S.C. § 102(e) ................................. 27

         2.     The Mehrabani-Farsi Patent Application Discloses Each and Every Element of Claims 1, 3, 17, and 19 of the '130 Patent ............................. 27

V.     **SUMMARY JUDGMENT OF NON-INFRINGEMENT** ............................... 37

     A.     Legal Standards .................................................................................. 38

     B.     Version 1 of The Club Mobile App Does Not Infringe The '130 Patent. ............. 39

     C.     The Club Mobile App Does Not Infringe The '130 Patent Because It Does Not "Determin[e] That Said Mobile Wireless Communications Device Is Located At A Given Shopping Facility" .................................................. 40

         1.     The Club Mobile App does not literally infringe the "located at" limitation of the asserted '130 patent claims. ........................ 40

         2.     NMT has failed to put forth evidence that The Club Mobile App infringes the "located at" limitation under the doctrine of equivalents. ........................ 45

         3.     Because GGP does not practice each and every limitation of the asserted independent claims, GGP is entitled to summary judgment of non-infringement as to all asserted claims. ......................... 46

# TABLE OF AUTHORITIES

**Cases**

*Akamai Tech., Inc. v. Cable & Wireless Internet Serv., Inc.*,
344 F.3d 1186 (Fed. Cir. 2003) ............................................................................. 8

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001) ........................................................................... 33

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ....................................................................................... 6, 7

*Apple Computer, Inc. v. Articulate Systems, Inc.*,
234 F.3d 14 (Fed. Cir. 2000) ....................................................................... 10, 29

*AquaTex Indus., Inc. v. Techniche Solutions*,
479 F.3d 1320 (Fed. Cir. 2007) ........................................................................... 48

*Barmag Barmer Maschinenfebrik AG v. Murata Mach. Ltd.*,
731 F.2d 831 (Fed. Cir. 1984) .............................................................................. 7

*Beachcombers v. WildeWood Creative Prods., Inc.*,
31 F.3d 1154 (Fed. Cir. 1994) ...................................................................... 8, 18

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ..................................................................................... 40, 41

*Computer Docking Station Corp. v. Dell, Inc.*,
2007 WL 5117465 (W.D. Wis. Jan. 11, 2007) ...................................................... 41

*Exigent Tech., Inc. v. Atrana Sols., Inc.*,
442 F.3d 1301 (Fed. Cir. 2006) ........................................................................... 41

*General Electric Co. v. Int'l Trade Com'n*,
670 F.3d 1206 (Fed. Cir. 2007) ........................................................................... 42

*Gentry Gallery, Inc. v. Berkline Corp.*,
134 F.3d 1473 (Fed. Cir. 1998) ............................................................................. 6

*Iovate Health Sciences, Inc. v. Bio-Engineered Supplements & Nutrition, Inc.*,
586 F.3d 1376 (Fed. Cir. 2009) ............................................................................. 7

*Krippelz v. Ford Motor Co.*,
667 F.3d 1261 (Fed. Cir. 2012) ................................................................ 15, 16, 18

*Laitram Corp. v. Morehouse Industries, Inc.*,
143 F.3d 1456 (Fed. Cir. 1998) ........................................................................... 42

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ........................................................................................ 7

*Monsanto Co. v. Syngenta Seeds, Inc.*,
    503 F.3d 1352 (Fed. Cir. 2007) ................................................................. 42, 49

*Novartis Corp. v. Ben Venue Labs., Inc.*,
    271 F.3d 1043 (Fed. Cir. 2001) .......................................................................... 40

*Sitrick v. Dreamworks LLC,*,
    516 F.3d 933 (Fed. Cir. 2008) ........................................................................... 15

*Sterner Lighting, Inc. v. Allied Elec. Supply, Inc.*,
    431 F.2d 539 (5th Cir. 1970) ............................................................................. 33

*Sunbeam Prods., Inc. v. Homedics, Inc.*,
    670 F. Supp. 2d 873 (W.D. Wis. 2009) ............................................................... 7

*Tanabe Selyaku Co. v. U.S. Intern. Trade Com'n*,
    109 F.3d 726 (Fed. Cir. 1997) ........................................................................... 49

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
    247 F.3d 1316 (Fed. Cir. 2001) ............................................................... 8, 40, 44

*Upsher-Smith Laboratories, Inc. v. Pamlab, L.L.C.*,
    412 F.3d 1319 (Fed. Cir. 2005) .......................................................................... 28

*Wahpeton Canvas Co., Inc. v. Frontier, Inc.*,
    870 F.2d 1546 (Fed. Cir. 1989) .......................................................................... 49

**Statutes**

35 U.S.C. § 102(b) ................................................................................................. 12, 13

35 U.S.C. § 102(e) ....................................................................................................... 31

35 U.S.C. § 102(e)(1) .................................................................................................. 31

**Rules**

Fed. R. Civ. P. 56(c) ................................................................................................... 10

## I.    INTRODUCTION

NMT's infringement and validity positions in this case rise and fall on one issue: that the term "determining that said mobile wireless communications device is ***located at*** a given shopping facility" must be understood to mean "determining that said mobile wireless communications device is ***associated with*** a given shopping facility."  Although this Court has rejected that notion, and NMT has agreed that the Court's plain meaning construction of the "located at" limitation in the *Simon* case be applied in this case, NMT continues to advocate positions that require "located at" to mean "associated with."  With respect to validity, NMT takes the position that the "located at" limitation is met only if the server system determines that the mall and the device are associated.  Indeed, NMT relies on this position to support its argument that prior art that determines the mobile device is ***within*** a mall does not mean the device is determined to be located at a mall.  According to NMT, such prior art does not meet the "located at" limitation because although the location of the device within the mall has been determined, the system has not determined that the mobile device is associated with the mall.

With respect to infringement, NMT relies on the position that when GGP's The Club Mobile App server receives a request from the mobile device to associate the device with a particular mall, even though the server receives no information and knows no information about the physical location of the device, the association alone is enough to meet the "located at" claim limitation.  In short, NMT asserts that the server system determines that the phone is associated with, and thus located at, a GGP mall.  This Court has rejected that interpretation of the claim language.

Thus, to preserve validity and prove infringement, NMT must rely on a claim construction that has been rejected by this Court.  NMT's expert's opinions regarding infringement and validity with regard to the "located at" term continue to apply NMT's

"associated with" claim construction.  But this Court decided otherwise, and without the "associated with" construction, NMT cannot win on either invalidity or infringement.  Accordingly, GGP's motion for summary judgment should be granted.

## II.    FACTUAL BACKGROUND

### A.  General Technology Background

U.S. Patent No. 7,805,130 ("the '130 patent") discloses a location-based services (LBS) mobile application.  (PFF ¶ 35.)  A purported advantage of LBS to the marketing field is the ability to provide real-time advertisements specific to a mobile device's current location.  (PFF ¶ 36.)  Many early LBS systems required some form of user input—that is, the device asked the mobile device user to input his or her current location.  (PFF ¶ 37.)  Although these services allowed for false positives, what made them location-based was the fact that the computer software supporting these systems was programmed based on the assumption that the user would provide the service with accurate and current information regarding the user's location.  (PFF ¶ 38.)

By 2005, automatic LBS techniques were well-known and well-documented. Three examples of these techniques were Cell of Origin, Global Positioning System (GPS), and Wireless LAN.  (PFF ¶ 39.)  All of these techniques could determine that a mobile device was physically located at a particular location without the need for input from the mobile device user.  (PFF ¶ 39.)  Cell of Origin, also known as Cell-ID, determines the location of the mobile device based on the "cell" (i.e. portion of the service area) in which the mobile device is located.  (PFF ¶ 40.)  GPS determines location by using multiple satellites to pinpoint the precise location of a mobile device.  (PFF ¶ 41.)  Wireless LAN determines the location by the identity of the particular base station from which the mobile device is obtaining wireless internet.  (PFF ¶ 42.)

Thus, by 2005, the methods and systems for providing location-based services were well-known and well-documented. (PFF ¶¶ 39-43.) In addition, by 2005, location-based solutions for providing advertisements at a variety of well-known commercial settings had appeared in the public domain. (PFF ¶ 43.) Among these solutions were a variety of systems and methods for providing LBS, including advertisements to shoppers at a shopping mall. (PFF ¶ 56.)

The '130 patent was filed on May 26, 2006. (PFF ¶ 22.) It claims priority to several provisional patents, the earliest of which was filed on November 25, 2005. (PFF ¶ 23.) The '130 patent issued on September 28, 2010. (PFF ¶ 22.) NMT contends that the '130 patent was conceived on February 3, 2005, and further contends that three of the asserted claims, 1, 3, and 19, are entitled to a priority date of November 25, 2005. (PFF ¶¶ 24-25.) NMT contends that the fourth asserted claim, 17, is entitled to a priority date of May 26, 2006. (PFF ¶ 26.)

## B. GGP's The Club Mobile App

The Club Shopping Mall Guide ("The Club Mobile App") is a mobile application ("mobile app"). (PFF ¶ 200.) A mobile app is a computer program designed specifically for use on a mobile device, such as a smartphone or a touch pad. (PFF ¶ 200.) The Club Mobile App is designed for use on iPhone and Android platform devices and provides information to potential customers of GGP malls.[1] (PFF ¶¶ 203-204.)

The Club Mobile App is a client-server type application. (PFF ¶ 218.) The "client" is the software located on the phone that implements The Club Mobile App. (PFF ¶ 219.) The

_____

[1] The accused functionality of The Club Mobile App is the same for both The Club Mobile App for iPhone and The Club Mobile App for Android. (PFF ¶ 226.) Thus, the remainder of the discussion will refer to "The Club Mobile App" without distinguishing between the iPhone and Android versions unless explicitly stated.

"servers" are software implemented on computers that are remote from the phone. (PFF ¶ 220.) The remote servers that support The Club Mobile App are HTTP servers, also known as web servers. (PFF ¶ 222.) The Club Mobile App's remote web servers support The Club Mobile App by providing raw data based on user requests. (PFF ¶ 221.)

The first time that a mobile device user launches The Club Mobile App, the app does not default to the closest GGP mall. (PFF ¶ 229.) Instead, a process begins whereby the user must choose a GGP mall about which to receive information. (PFF ¶¶ 227-228.) The user can choose any participating GGP mall, regardless of the user's physical location, via the steps described below. (PFF ¶ 228.)

First, software on the mobile device sends a message known as a HTTP GET request to the remote web servers. (PFF ¶ 230.) This first HTTP GET request retrieves a list of GGP malls, the reference.zip file. (PFF ¶ 230.) The reference.zip file is a SQLite database that lists each of GGP's participating malls and includes, among other information, each mall's name, address, latitude and longitude, and "venue uuid." (PFF ¶ 231.) The venue uuid is a string of letters and numbers that is unique to a particular GGP mall. (PFF ¶ 232.) Venue uuid is oftentimes referred to as the "venue id." (PFF ¶ 233.)

After downloading the reference file, software on the mobile device processes the data to create a graphical user interface that allows the user to select a GGP mall. (PFF ¶ 234.) Specifically, software on the mobile device uses the latitude/longitude coordinates from the reference file to overlay all participating GGP malls onto a map of the United States. (*Id.*) Then, the user is presented with a screen that displays his or her current location and a certain distance around the user. (*Id.*) All GGP malls within that distance are displayed on the screen as a star-shaped map marker. (*Id.*) If no malls are within that distance, no malls are displayed. (*Id.*) In

4

either case, the user can zoom out to see all participating GGP malls on a single map. (PFF ¶ 235.) The user can also zoom in on any malls he or she is interested in, even malls that are far away from the user's current location. (*Id.*)

Once the mobile device user has determined his mall of interest, he selects the mall in one of two ways. (PFF ¶ 236.) The user may select the star-shaped marker that represents the GGP mall on the map. (*Id.*) In the alternative, the user may search for the mall in the search bar at the top of the screen and then select the mall from a drop-down list that appears below the search bar. (*Id.*)

When the user selects his mall of interest, software on the mobile device associates that mobile device with the chosen mall. (PFF ¶ 237.) Then, the mobile device sends a second HTTP GET request to a remote server. (PFF ¶ 238.) This second HTTP GET request includes the venue id, as follows: /adws/v1/destination/<<venue uuid>>/offers. (PFF ¶ 239.) In response to this HTTP GET request, the server will return raw data that includes, among other things, sales and events for the requested mall as part of a single file known as a JSON array. (PFF ¶ 240.)

The HTTP GET request that includes the venue id and retrieves mall-specific data does not include any information regarding the mobile device's current physical location. (PFF ¶ 254.) The request does not include the mall's latitude and longitude or the mall's address. (PFF ¶ 253.) Instead, a mobile device user must choose to receive information regarding a participating GGP mall anywhere in the country, and at no time does the mobile device's physical location impact the information returned in response to the second HTTP GET request. (PFF ¶¶ 227, 247, 253-255.)

Once the user has selected a GGP mall, The Club Mobile App will "remember" that mall until the user changes it. (PFF ¶ 244.) Accordingly, the next time that a user launches The Club Mobile App, the app will provide the user with information for his previously selected mall, regardless of his current physical location. (PFF ¶ 245.) Indeed, if a mobile device user has selected a particular GGP mall, such as Water Tower Place in Chicago, IL, and the user brings his mobile device to a different GGP mall, such as Mayfair Mall in Milwaukee, WI, The Club Mobile App will continue to provide the user with information for Water Tower Place even as the user is physically present within, or close to the Mayfair Mall. (PFF ¶ 246.)

NMT asserts that The Club Mobile App infringes the '130 patent because The Club Mobile App allegedly performs the step of "determining that said mobile communications device is located at a given shopping facility." (PFF ¶¶ 249-250.) As described above, The Club Mobile App does not determine that a mobile communications device is located at a given GGP mall. (PFF ¶¶ 259, 261.) Instead, the functionality that NMT identifies as meeting this claim element associates a particular GGP mall with a mobile communications device. (PFF ¶¶ 194-195, 237, 253.)

### C. The Club Mobile App Source Code Versions

Two source code versions of The Club Mobile App have been released since November 2010. (PFF ¶ 207.) The first of these, Version 1, was operative from November 2010 until October 14, 2011. (*Id*.) Version 2 replaced Version 1 on October 14, 2011. (PFF ¶¶ 208-210.) Version 2 includes features and functionality not present in Version 1. (PFF ¶ 211.)

## III. SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment "is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1476 (Fed. Cir. 1998); Fed. R. Civ. P. 56(c); *see also Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986). Summary judgment is "as appropriate in a patent case as in any other." *Barmag Barmer Maschinenfebrik AG v. Murata Mach. Ltd.*, 731 F.2d 831, 835 (Fed. Cir. 1984). Although legitimate evidentiary inferences must be drawn in the nonmovant's favor, NMT cannot create a genuine dispute as to any material fact merely by stating that a fact is challenged; it must show the existence of a genuine dispute for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "A factual issue is genuine only if the evidence is such that a reasonable fact finder, applying the appropriate evidentiary standard of proof, could return a verdict for the nonmoving party." *Sunbeam Prods., Inc. v. Homedics, Inc.*, 670 F. Supp. 2d 873, 884 (W.D. Wis. 2009), *aff'd* 412 Fed. Appx. 263 (Fed. Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). It is NMT's burden as the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *Id.*

## IV.   SUMMARY JUDGMENT OF INVALIDITY

### A.  Legal Standards

A patent claim is invalid as anticipated if a single enabling prior art reference discloses each and every element of the claimed device or method. *Iovate Health Sciences, Inc. v. Bio-Engineered Supplements & Nutrition, Inc.*, 586 F.3d 1376, 1380 (Fed. Cir. 2009). Although anticipation is a question of fact, summary judgment of anticipation is appropriate if the record reveals no genuine dispute of material fact that a single prior art reference discloses all elements of the claim, either expressly or inherently. *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1327 (Fed. Cir. 2001).

Anticipation is a two step analysis. *See Akamai Tech., Inc. v. Cable & Wireless Internet Serv., Inc.*, 344 F.3d 1186, 1195 n.4 (Fed. Cir. 2003). First, the claims of the patent at issue must be construed. *Id.* Second, the properly-construed claims must be compared to the

prior art to determine whether the prior art meets the limitations of the claims. *Beachcombers v. WildeWood Creative Prods., Inc.*, 31 F.3d 1154, 1160 (Fed. Cir. 1994). If no reasonable jury could find that the prior art does not disclose the limitations of the claims, summary judgment of invalidity is appropriate. *Telemac*, 247 F.3d at 1327.

### B. The Treyz Patent Anticipates Claims 1, 3, 17, and 19 of The '130 Patent.

The United States Patent and Trademark Office did not consider the Treyz patent (U.S. Patent No. 6,587,835) during prosecution of the '130 patent. (PFF ¶ 46.) The Treyz patent discloses the use of a handheld computing device to provide marketing incentives to shoppers who are currently shopping at a particular mall. (PFF ¶ 47.) Treyz further discloses that shoppers use the handheld computing device to communicate with equipment associated with the mall over a wireless link. (PFF ¶ 48.) Moreover, Treyz discloses that this system "monitor[s] the user's location within the establishment; and display[s] promotional material on the handheld computing device based on the user's location." (PFF ¶ 51.) The detailed disclosure in the Treyz patent discloses multiple devices and methods for accomplishing the purpose of providing time-sensitive shopping information to current mall shoppers, including a menu-based system and method that tracks the asserted '130 patent claims.

NMT's expert makes only one distinction between Treyz and the asserted '130 patent claims – "Treyz does not disclose the server system determining or coming to a decision that the mobile wireless communications device is located at or associated with a given shopping facility." (PFF ¶ 49.) But Mr. Hussmann's distinction ignores numerous disclosures in Treyz, including those that unequivocally disclose the "located at" limitation. With the exception of the "located at" term, Dr. Taylor's analysis of the Treyz patent stands unrebutted by NMT's expert Mr. Hussmann. Thus, NMT cannot raise a genuine issue of material fact as to the Treyz reference, and GGP's motion for summary judgment of invalidity should be granted.

## 1. The Treyz Patent Is Prior Art Under 35 U.S.C. § 102(b)

The Treyz Patent is prior art to the '130 Patent under 35 U.S.C. § 102(b). Section 102(b) provides that "[a] person shall be entitled to a patent *unless* . . . (b) the invention was *patented* . . . in this or a foreign country . . . more than one year prior to the date of the application for patent in the United States . . . ." 35 U.S.C. § 102(b) (emphasis added). The Treyz Patent issued on July 1, 2003, more than one year prior to the February 3, 2005 date on which NMT claims the '130 patent was conceived. (PFF ¶¶ 24, 45.) Accordingly, the Treyz Patent constitutes prior art under 35 U.S.C. § 102(b).

## 2. The Treyz Patent Discloses Each and Every Element of Claims 1, 3, 17, and 19 of the '130 Patent

The parties are in agreement that all disputed claim terms shall be interpreted in accordance with their plain and ordinary meaning. (PFF ¶¶ 172-174.) Applying these plain and ordinary meanings, Treyz discloses both a system and a method that practices each and every limitation of claims 1, 3, 17, and 19 of the '130 patent, as described below. (PFF ¶ 101.)

### a. Treyz Discloses Each and Every Element of Independent Claim 1, and Dependent Claims 3, and 17 of the '130 Patent

#### i. "A marketing method"

When the preamble of a claim "merely states a purpose or intended use of the invention," the preamble is not a claim limitation. *Apple Computer, Inc. v. Articulate Systems, Inc.*, 234 F.3d 14, 22 (Fed. Cir. 2000). Here, the term "marketing method" states the purported invention's intended purpose of providing "a new method of advertising." (PFF ¶ 168.) Nonetheless, to the extent the Court finds the preamble of claim 1 to be limiting, Treyz discloses "a shopping assistance service . . . that provides users with handheld computing devices access to directory information, . . . product information, . . . [and] advertisements." (PFF ¶ 52.) Treyz

further discloses "[a] method for providing a user at a handheld computing device with a shopping assistance service for an establishment having a plurality of stores." (PFF ¶ 53.) Thus, Treyz discloses a marketing method. Dr. Taylor agrees, and Mr. Hussmann does not dispute, that Treyz discloses a marketing method. (PFF ¶¶ 54-55.) Thus, there can be no genuine dispute that Treyz discloses this limitation.

### ii. "at a server system"

The Treyz "shopping assistance service" may be implemented "at a server system":

> ***Services may also be provided using remote applications.*** For example, the recipe service may be implemented using a remote server connected to communications network 32 (e.g., a remote server located at or associated with service provider 46). ***The user may use*** a platform such as in-home electronic device 28, ***handheld computing device 12,*** automobile personal computer 44, or computer 42 ***to access the remote server***. A web browser or other suitable browser application such as a microbrowser may be used to access the remote server.

> Remote applications and services may be desirable when providing centralized access to certain information. . . . ***Services that are accessed remotely may use client-server or distributed computing arrangements.*** Remotely implemented services may also interact with locally-executed applications. In general, services may be provided using local arrangements, remote arrangements, or arrangements that use a combination of local and remote arrangements. ***The applications that individually or collectively support the features of such services are generally referred to herein as "applications" or "services" regardless of the nature of the platform or platforms on which they are implemented***.

> \*\*\*

> ***Services such as*** maintaining a customer's shopping list or wish list or maintaining information on products, categories of products, and manufacturers, ***providing directory information, maps, advertisements and other promotional information, etc. may be performed using computers at any suitable locations.***

> Handheld computing device 12 may access such services by using a local wireless link to access the computer with which the service is provided. Handheld computing device 12 may also access

10

services by using a local wireless link to access a wireless local network access point. A communications network such as the Internet may be used for communications between the wireless local network access point and the service. ***Services may also be accessed using remote wireless links or wired links, or by transferring data to and from the service using removable storage media or the like.*** (PFF ¶¶ 56-57) (emphasis added).

Dr. Taylor agrees, and Mr. Hussmann does not dispute, that Treyz discloses that the "marketing method" is implemented with a "server system." (PFF ¶¶ 58-59.) Thus, there can be no genuine dispute that Treyz discloses this limitation.

### iii. "receiving from a mobile wireless communications device a wireless call or message"

Treyz discloses that the remote server system that implements the shopping assistance service receives wireless calls and messages from a mobile wireless communications device:

> ***Handheld computing device 12 may be used to interact with a merchant or service provider or other entity. As shown in FIG. 13, handheld computing device 12 may interact with a merchant or other entity over a wireless link 180.*** Wireless link 180 may be a local or remote wireless link. Merchant 178 may have an associated computer 184. Computer 184 may be located on the merchant's premises, in a nearby location, or at a remote location. Computer 184 may have an associated wireless transmitter/receiver 182. Computer 184 may communicate with handheld computing device 12 using wireless transmitter/receiver 182.
>
> ***If wireless transmitter/receiver 182 supports remote wireless communications, handheld computing device 12 may communicate with merchant 178 or other entity over a remote wireless link.*** A remote link may be used to obtain a shopping list from a remote server, to retrieve a directory, to retrieve product information from a remote database, to access a remote web site containing product information or personal information, to access a service implemented at a remote service provider, etc. These are merely illustrative examples. (PFF ¶ 60.)

Treyz further discloses that the remote server system that implements the shopping assistance service may receive a wireless call or message from a mobile wireless communications device that invokes the shopping assistance service:

> **Services such as** maintaining a customer's shopping list or wish list or maintaining information on products, categories of products, and manufacturers, **providing directory information, maps, advertisements and other promotional information, etc. may be performed using computers at any suitable locations**.
>
> **Handheld computing device 12 may access such services by using a local wireless link to access the computer with which the service is provided.** Handheld computing device 12 may also access services by using a local wireless link to access a wireless local network access point. A communications network such as the Internet may be used for communications between the wireless local network access point and the service. Services may also be accessed using remote wireless links or wired links, or by transferring data to and from the service using removable storage media or the like. (PFF ¶ 61.)

Dr. Taylor agrees, and Mr. Hussmann does not dispute, that Treyz discloses that the server system of Treyz receives a wireless call or message from a mobile wireless communications device. (PFF ¶¶ 62-63.) Thus, there can be no genuine dispute that Treyz discloses this limitation.

> iv. **"determining that said mobile wireless communications device is located at a given shopping facility"**

Treyz discloses that the remote server system that implements the shopping assistance service can receive a message from a mobile device as it enters a particular mall and thereby return information to the phone that causes the phone to automatically display a shopping assistance service on its screen entitled "Welcome to Sunrise Mall".



FIG. 37

An illustrative screen 428 that may be provided by handheld computing device 12 when providing a shopping assistance service in a shopping mall environment is shown in FIG. 37. ***Screen 428 may be displayed after the shopping assistance service is invoked.*** The service may be invoked by selecting an icon or other on-screen option displayed on handheld computing device 12. ***The icon or other suitable notification may be automatically displayed by handheld computing device 12 when the user enters the mall.*** For example, the handheld computing device 12 may detect the presence of local wireless transmissions from equipment in the mall that is advertising the availability of the shopping assistance service and may automatically convey information on the availability of the service to the user by displaying the icon. If desired, the shopping assistance service may be automatically invoked when handheld computing device 12 detects the presence of suitable local wireless transmissions. These are merely illustrative examples. Any suitable technique may be used to invoke the shopping assistance service if desired. (PFF ¶ 64.)

Additional disclosure throughout Treyz confirms that Treyz's server system determines that the mobile device is located at a given shopping facility. (PFF ¶ 68.) For example, several screens selectable by the user of the shopping assistance service show that the server system has determined that the mobile device is located at that mall:



FIG. 42      FIG. 45      FIG. 72

(PFF ¶¶ 65-67.)

  Mr. Hussmann's position that Treyz does not disclose a server system "determining or coming to a decision that the mobile wireless communications device is located at or associated with a given shopping facility" is contradicted by the disclosure in Treyz and, as a result, cannot create an issue of fact necessary to avoid summary judgment. *Krippelz v. Ford Motor Co.*, 667 F.3d 1261, 1268-69 (Fed. Cir. 2012) ("[T]he conclusory testimony of an expert witness . . . cannot create an issue of fact if none otherwise exists") (citing *Sitrick v. Dreamworks LLC,* 516 F.3d 933, 1001 (Fed. Cir. 2008). Mr. Hussmann appears to have two bases as to why Treyz fails to disclose the "located at" limitation: (1) "Treyz discloses that GPS can be used to determine the location of the handheld device, not that it is located at a given shopping facility;" and (2) "the server [in Treyz] is not determining or coming to a decision that the wireless communications device is located at or associated with a specific shopping facility, but determining that it is within proximity of certain stores." (PFF ¶ 70.) These arguments are conclusory and counter to the disclosure in Treyz, and cannot form the basis of a genuine factual dispute regarding the "located at" limitation.

Mr. Hussmann's first argument, that GPS can be used to determine the location of the handheld computing device but not its location at a shopping facility, is contradicted by the express disclosure in Treyz. To support this opinion, Mr. Hussmann cites a six line excerpt from Treyz. (PFF ¶ 71.) But the portion of Treyz cited by Mr. Hussmann, in combination with the remainder of the disclosure in Treyz, discloses that GPS may be used to determine that the mobile communications device is located at a given shopping facility. (PFF ¶¶ 72-75.)

Specifically, Treyz discloses that the mall specific shopping assistance service may be "invoked . . . [and] automatically displayed by handheld computing device 12 when the user enters the mall." (PFF ¶ 74.) Treyz goes on to explain that "any suitable technique may be used to invoke the shopping assistance service if desired." (PFF ¶ 74.) And the disclosure that Mr. Hussmann uses as support for his opinion describes these "suitable techniques," including GPS. (PFF ¶ 75.) Thus, Mr. Hussman's first argument, which fails to take into account the entire disclosure of Treyz, should be rejected. *Krippelz*, 667 F.3d at 1268-69 (holding claim invalid as anticipated when prior art included "numerous disclosures" of claim limitations and expert's testimony to the contrary "failed to take into account the entire [reference's] disclosure").

Mr. Hussmann's second argument -- that the server does not "determine or come to a decision that the wireless communications device is located at or associated with a specific shopping facility but that it is within proximity of certain stores" -- is illogical. (PFF ¶ 70.) The stores referenced in this portion of Mr. Hussmann's report are stores within a particular mall:

> Local wireless transmitter/receivers may not have sufficient range to cover an entire mall or large store. As shown in FIG. 15, a network of local wireless transmitter/receivers 206 may be used to provide local wireless communications coverage for the entire establishment. Transmitter/receivers 206 may form a wireless local area network.

<p style="text-align:center">***</p>

As shown in FIG. 16, local wireless transmitter/receivers may have ranges that are localized near certain stores. For example, transmitter/receiver 226 is in the proximity of store 228. The range of transmitter/receiver 226 is shown by circle 230. Transmitter/receiver 226 may or may not be associated with or controlled exclusively by store 228. Transmitter/receiver 232 is located in store 234. The range of transmitter/receiver 232 is shown by circle 236. Transmitter/receiver 232 may be associated with store 234 and may be controlled primarily by or exclusively by store 234. The ranges of both transmitter/receivers 226 and 232 may overlap substantially with corridor 238, so that users with handheld computing devices 12 in the corridor 238 may interact with stores 228 and 234 or other entities using local wireless communications.

*** 

*In arrangements shown such as those shown in FIGS. 15*, 16, and 17, the range of each local wireless transmitter/receiver is limited. *Accordingly, when a handheld computing device 12 is communicating with a particular local wireless transmitter/receiver, the location of the handheld computing device 12 can be determined.* In particular, with an arrangement such as that of FIG. 16, it can be determined when the user is within the proximity of certain stores. (PFF ¶ 77) (emphasis added).

When the server system determines that the user is within proximity to a particular store that is within a particular mall, the server system has determined that the mobile device is located at that particular mall. (PFF ¶¶ 68, 77.)

Moreover, Mr. Hussmann's opinion requires the "located at" limitation be construed in accordance with NMT's "associated with" construction, which this Court has rejected. Indeed, Mr. Hussmann's deposition testimony exposes the holes in his logic and the lengths to which NMT appears willing to go to change the definition of "located at" to "associated with".

Q. Can you explain to me again how determining that the device is within the mall is not determining that it's located at the mall?

A. Determining a position -- there need not be a determination made that a device is at a mall if you're determining that the device is within a mall. There's no determination being made there.

16

Determining location within a mall -- when you're determining location within a mall, you're not determining if the device is at the mall or not. You're determining where the device is within the mall.

Q. If the server system that in this case provides services to the user within the mall determines that the user is within the mall, it's your opinion that server system is not determining that the user is located at the mall?

Mr. Albridge: Objection to form. Asked and answered.

The Witness: That's correct. (PFF ¶ 78.)

By Mr. Hussmann's reasoning, the only way that a phone could be "determined" to be "at" the mall is for the server to "associate" the phone and the mall. If there is no "association," there is no location. But by the plain meaning of the "located at" term adopted by this Court, this cannot be the case. (PFF ¶ 172); *Beachcombers*, 31 F.3d at 1160 (anticipation analysis "involves determining whether the limitations of the claims as properly interpreted are met by the prior art").

Thus, neither of the bases for Mr. Hussmann's opinion logically follow from the disclosure in Treyz. NMT cannot raise a material issue of fact based on conclusory expert testimony that is lacking in factual support, indeed, that is counter to the factual record. *Krippelz*, 667 F.3d at 1269 ("The opinions of [plaintiff's expert] are not a substitute for the actual [reference's] disclosure.") And based on the disclosure in Treyz, NMT cannot reasonably dispute that Treyz discloses that the server system determines that the mobile communications device is located at a given shopping facility. *See supra*. Thus, there can be no genuine dispute that Treyz discloses this limitation.

v. **"correlating a menu of choices specific to said given shopping facility with said given shopping facility"**

Treyz discloses that the shopping assistance service implemented at a remote server system may be used for "providing directory information, maps, advertisements and other promotional information." (PFF ¶ 79.) Treyz further discloses that this information may be provided to a mobile communications device in menu format via screen 428.



FIG. 37   (PFF ¶ 80.)

Dr. Taylor agrees, and Mr. Hussmann does not dispute, that Treyz discloses that the server system of Treyz correlates a menu of choices specific to said given shopping facility with said given shopping facility. (PFF ¶¶ 81-82.) Thus, there can be no genuine dispute that Treyz discloses this limitation.

> vi. **"responsive to said receiving, returning to said wireless communications device information to provision said wireless communications device with said menu of choices"**

Treyz discloses that the shopping assistance service implemented at a remote server system may be used for "providing directory information, maps, advertisements and other promotional information." (PFF ¶ 83.) Treyz further discloses that this information may be provided to a mobile device in menu format via screen 428. (PFF ¶ 83.) Specifically, "[s]creen 428 may contain options such as what's new option 430, general information option 432,

directory option 434, map option 436, specials option 438, and store and product locator option 440. Screen 428 may also contain promotional material such as advertisement 442." (PFF ¶ 83.)



FIG. 37

Dr. Taylor agrees, and Mr. Hussmann does not dispute, that Treyz discloses that the server system of Treyz returns to said wireless communications device information to provision said wireless communications device with said menu of choices. (PFF ¶¶ 84-85.) Thus, there can be no genuine dispute that Treyz discloses this limitation.

> **vii. "subsequent to said returning said information, on receiving from said wireless communications device a choice selected from said menu, returning to said wireless communications device one or more text-based marketing messages, at least one of said text-based marketing messages comprising a marketing incentive particular to a store in said given shopping facility."**

Treyz discloses that the user may select the "specials" option from the menu provided by the server system. (PFF ¶ 86.) Upon making this selection, the server system will return a number of specials available for particular stores at the mall, some of which may be time sensitive. (PFF ¶ 86.)



FIG. 46

If the user selects an option such as specials option 438 of FIG. 37, handheld computing device 12 may display a screen such as screen 520 of FIG. 46. Screen 520 may contain passive and interactive information on specials available at the mall. Specials option 522 may allow the user to obtain a discount at a clothing store. Option 524 may allow the user to obtain a discount on a haircut. Option 526 may allow the user to obtain a discount on a meal at a restaurant. If the user desires to view more options, the user may select more option 528. The illustrative options of FIG. 46 require that the user respond within a certain time period to obtain the offered discounts. (PFF ¶ 86.)

Dr. Taylor agrees, and Mr. Hussmann does not dispute, that Treyz discloses that the server system of Treyz, subsequent to said returning said information, on receiving from said wireless communications device a choice selected from said menu, returning to said wireless communications device one or more text-based marketing messages, at least one of said text-based marketing messages comprising a marketing incentive particular to a store in said given shopping facility. (PFF ¶¶ 87-88.) Thus, there can be no genuine dispute that Treyz discloses this limitation.

> **viii. "The method of claim 1 wherein said receiving from a wireless device a wireless call or message comprises receiving said call or message with an associated geographic indication." (Claim 3)**

Treyz discloses that the server system may receive a wireless call or message that includes information regarding the user's current location as determined by GPS, cell of origin, or triangulation.

> *If desired, the location of handheld computing device 12 and therefore the user may be determined using global positioning system (GPS) satellites, as shown in FIG. 18.* Handheld

computing device 12 may receive satellite signals from GPS satellites 246. By analyzing these signals with GPS receiver 248, handheld computing device 12 can determine the location of the user. The resolution of current GPS systems is purposefully limited by the government. *If a higher resolution is desired, a differential GPS (DGPS) system may be used. In DGPS systems, the known (e.g., surveyed) position of a base station such as base station 250 may be used as a reference point.* By comparing the known position of base station 250 that is indicated by a GPS receiver at station 250, the error of the GPS signal in the proximity of base station 250 can be determined. If a handheld computing device 12 is relatively close to such a base station (e.g., within a number of miles), the handheld computing device's GPS location may be corrected by the same amount that was determined to be necessary to correct the position of base station 250.

If desired, handheld computing device 12 and base station 250 may be in wireless communications (e.g., over a remote wireless link 252 using antenna 254). *The DGPS correction to the position of handheld computing device 12* may be made at the handheld computing device 12 (by supplying the needed correction data to the handheld computing device 12 from base station 250), at base station 250 (e.g., by providing the handheld computing device's raw GPS position to base station 250), *or may be performed elsewhere (e.g., by providing an appropriate facility with the error correction data from base station 250 over a communications network and by providing the GPS position data of the handheld computing device using wireless communications and a communications network path*).

Other techniques may be used for determining the location of handheld computing device 12 if desired. For example, a rough position of handheld computing device 12 may be obtained by determining which terrestrial antennas (or more broadly which satellites) are receiving communications from handheld computing device 12. An approach of this type that uses terrestrial antennas in communication with handheld computing device 12 over remote wireless links may be sufficiently accurate to place handheld computing device in a particular city or portion of a city or the like. More precise location information may be obtained using time-of-flight and triangulation techniques. Such techniques may involve the use of multiple terrestrial antennas.

These approaches, a combination of these approaches, or any other suitable location-determination arrangements may be used if desired. (PFF ¶ 89.)

Dr. Taylor agrees that Treyz discloses this limitation. (PFF ¶ 90.) Mr. Hussmann provides no specific opinion regarding the Treyz' disclosure of claim 3, other than to say that it is not anticipated because it depends from claim 1. (PFF ¶ 91.) Thus, there can be no dispute that Treyz discloses the limitation of claim 3.

> ix. **"The method of claim 1 wherein said menu is a further menu and said choice is a further choice and wherein said returning returns information to provision said wireless communications device with a first menu and, upon selection of a first choice from said first menu, with said further menu." (Claim 17)**

Treyz discloses that the server system may return a first menu and, upon receiving a choice from the first menu, a further menu. In one embodiment of the shopping assistance service for shopping malls, Treyz discloses that:

> An illustrative screen 428 that may be provided by handheld computing device 12 when providing a shopping assistance service in a shopping mall environment is shown in FIG. 37. . . . Screen 428 may contain options such as what's new option 430, general information option 432, directory option 434, pap option 436, specials option 438, and store and product locator option 440. . . . If the user selects directory option 434 of FIG. 37, handheld computing device 12 may display a screen such as screen 476 of FIG. 40. Screen 476 may contain a list 478 of various types of stores. . . . If a user selects a store category such as shoes from a directory screen such as screen 476, handheld computing device 12 may display a screen such as screen 484 of FIG. 41. Screen 484 may contain promotional information such as advertisement 486. (PFF ¶ 92.)



FIG. 37          FIG. 40          FIG. 41

Moreover, Dr. Taylor agrees that Treyz discloses this limitation. (PFF ¶ 93.) Mr. Hussmann provides no opinion regarding Treyz' disclosure of claim 17, other than to say that it is not anticipated because it depends from claim 1. (PFF ¶ 94.) Thus, there can be no genuine dispute that Treyz discloses the limitation of claim 17.

> **b.**      **Treyz Discloses Each and Every Element of Independent Claim 19 of the '130 Patent**

NMT's expert's validity analysis for independent claims 1 and 19 is not materially different. When asked at his deposition, NMT's expert agreed that his validity analysis with respect to the independent claims 1 and 19 was the same. (PFF ¶ 95.) Accordingly, the analysis below for claim 19 is not materially different than the analysis for claim 1, as indicated.

> **i.**      **"A computer readable medium containing computer executable instructions which, when executed by a processor of a server cause said server to"**

The shopping assistance service disclosed in Treyz can be implemented on computer readable medium containing computer executable instructions that are executed by a processor of the server, as required by claim 19.

> ***Services may also be provided using remote applications.*** For example, the recipe service may be implemented using a remote server connected to communications network 32 (e.g., a remote server located at or associated with service provider 46). The user

may use a platform such as in-home electronic device 28, handheld computing device 12, automobile personal computer 44, or computer 42 to access the remote server. A web browser or other suitable browser application such as a microbrowser may be used to access the remote server.

Remote applications and services may be desirable when providing centralized access to certain information. . . . ***Services that are accessed remotely may use client-server or distributed computing arrangements.*** Remotely implemented services may also interact with locally-executed applications. In general, services may be provided using local arrangements, remote arrangements, or arrangements that use a combination of local and remote arrangements. ***The applications that individually or collectively support the features of such services are generally referred to herein as "applications" or "services" regardless of the nature of the platform or platforms on which they are implemented***.

***Services such as*** maintaining a customer's shopping list or wish list or maintaining information on products, categories of products, and manufacturers, ***providing directory information, maps, advertisements and other promotional information, etc. may be performed using computers at any suitable locations.*** . . .

Handheld computing device 12 may access such services by using a local wireless link to access the computer with which the service is provided. Handheld computing device 12 may also access services by using a local wireless link to access a wireless local network access point. A communications network such as the Internet may be used for communications between the wireless local network access point and the service. ***Services may also be accessed using remote wireless links or wired links, or by transferring data to and from the service using removable storage media or the like.*** (PFF ¶ 96)

A client-server application in the context of mobile devices, such as handheld computers, comprises software running on a mobile device and software running at a remote server. (PFF ¶¶ 218-21.) A server is a program running on a computer. (PFF ¶ 219.) Accordingly, Dr. Taylor agrees, and Mr. Hussman does not dispute, that Treyz discloses "[a] computer readable medium containing computer executable instructions that are executed by a

processor of a server." (PFF ¶¶ 97-98.)  Thus, there can be no dispute that Treyz discloses this limitation.

      ii.    **"on receiving from a mobile wireless communications device a wireless call or message"**

*See supra* Section IV.B.2.a.iii.  (PFF ¶ 99.)

      iii.    **"determining that said mobile wireless communications device is located at a given shopping facility"**

*See supra* Section IV.B.2.a.iv.  (PFF ¶ 99.)

      iv.    **"correlating a menu of choices specific to said given shopping facility with said given shopping facility"**

*See supra* Section IV.B.2.a.v.  (PFF ¶ 99.)

      v.    **"returning to said wireless communications device information to provision said wireless communications device with said menu of choices"**

*See supra* Section IV.B.2.a.vi. (PFF ¶ 99.)

      vi.    **"subsequent to said returning said information, on receiving from said wireless communications de vice a choice selected from said menu, returning to said wireless communications device one or more text-based marketing messages, at least one of said text-based marketing messages comprising a marketing incentive particular to a store in said given shopping facility."**

*See supra* Section IV.B.2.a.vii.  (PFF 100.)

## C. The Mehrabani-Farsi Patent Application Anticipates Claims 1, 3, 17, and 19 of the '130 Patent.

The United States Patent and Trademark Office did not consider the Mehrabani-Farsi Patent Application (U.S. Patent Application Publication No. 2005/0216334) during prosecution of the '130 patent.  (PFF ¶ 105.)  The Mehrabani-Farsi Patent Application discloses the claimed

marketing method of the '130 patent. In the system disclosed in Mehrabani-Farsi, the user accesses a server system by using a mobile wireless communications device to send the system a toll free number or a quick-dial number (e.g., a * number). (PFF ¶ 107.) The number terminates at a server, which, upon request, provides the user with a menu of malls. (PFF ¶ 108.) The user can choose a mall from the list. (PFF ¶ 109.) Then, the user is presented with a menu of stores in that mall, some of which may be offering coupons. (PFF ¶ 109.) The user can chose a store from this list, and the server system will return a text marketing message that includes a coupon for the chosen store. (PFF ¶ 110.)

NMT's expert distinguishes the Mehrabani-Farsi reference from the '130 patent on two grounds: (1) that it "does not disclose a server system coming to a decision that a mobile device is associated with a given shopping facility or determining that a mobile device is located at the given shopping facility"; (2) to the extent that Mehrabani-Farsi discloses determining that the mobile device is at a facility, it "occurs without receiving a wireless call or message at a server system." (PFF ¶ 111.) With regard to the second distinction, Mehrabani-Farsi discloses, "[t]he interaction by a consumer and system 10 starts by the consumer dialing a toll-free number or a quick-dial number of the mobile phone carrier." (PFF ¶ 112.) With regard to both distinctions, Mehrabani-Farsi discloses:

> As the availability of location information of mobile phones becomes more widespread in the domestic market, potential customers who have established a profile will automatically receive advertisement on their phones that match and conform to the customer's profiles, without having to initiate calls to the service. One attribute of when data is sent to a consumer is a range specified by the retailer (from three feet to many miles). That is transmission of advertisements to a consumer may occur only when the consumer is detected within a specified boundary. (PFF ¶ 113.)

Determining location via automatic location determination techniques necessarily requires the phone to send wireless calls or messages to server systems. (PFF ¶ 114.) In addition to

disclosing the transmission of advertisements to a consumer determined to be within a specified boundary, Mehrabani-Farsi further discloses "[t]he specification of locality may be modified or further refined by the customer, perhaps to a smaller area identified by a mall or a shopping center area or, in the limit, to a particular store."[2] (PFF ¶ 115.)

### 1. The Mehrabani-Farsi Patent Application is Prior Art to the '130 Patent Under 35 U.S.C. § 102(e)

The Mehrabani-Farsi patent application is prior art to the '130 Patent under 35 U.S.C. § 102(e)(1). Section 102 provides that "[a] person shall be entitled to a patent *unless* . . . (e) the invention was described in (1) an application for patent, published under section 122(b), by another *filed in the United States before the invention by the applicant for patent*." (emphasis added). The Mehrabani-Farsi patent application was filed on March 23, 2004, before the February 3, 2005 date that NMT contends the '130 patent was conceived. (PFF ¶¶ 24, 103.) Accordingly, the Mehrabani-Farsi patent application constitutes prior art under 35 U.S.C. § 102(e).

### 2. The Mehrabani-Farsi Patent Application Discloses Each and Every Element of Claims 1, 3, 17, and 19 of the '130 Patent

The parties are in agreement that all disputed claim terms shall be interpreted in accordance with their plain and ordinary meaning. (PFF ¶¶ 172-174.) Applying these plain and ordinary meanings, Mehrabani-Farsi discloses both a system and a method that practices each

---

[2] Moreover, Mehrabani-Farsi discloses, in addition to determining location via automatic techniques, the same method of "determining" that a phone is "located at" a mall that NMT identifies in the GGP Club Mobile App as infringing the "located at" limitation of the '130 patent – "[a] targeted customer may use his mobile phone to call a toll-free number and request various information regarding merchandise of interest to the customer" including selecting a mall from a list of possible malls. (PFF ¶¶ 116-120.) By "[a] century-old axiom of patent law," that which infringes if later, anticipates if earlier. *Upsher-Smith Laboratories, Inc. v. Pamlab, L.L.C.*, 412 F.3d 1319, 1322 (Fed. Cir. 2005). NMT cannot have it both ways.

and every limitation of claims 1, 3, 17, and 19 of the '130 patent, as described below.   (PFF ¶ 165.)

### a.   Mehrabani-Farsi Discloses Each and Every Element of Independent Claim 1, and Dependent Claims 3, and 17 of the '130 Patent

#### i.   "a marketing method"

When the preamble of a claim "merely states a purpose or intended use of the invention," the preamble is not a claim limitation.  *Apple Computer*, 234 F.3d at 22.  Here, the term "marketing method" states the purported invention's intended purpose of providing "a new method of advertising."  (PFF ¶ 168.)  Nonetheless, to the extent the Court finds the preamble of claim 1 to be limiting, Mehrabani-Farsi discloses "a business method and an implementing system for delivering an advertisement service that will provide targeted advertisements to the public, utilizing wireless and other mobile communications techniques." (PFF ¶ 125.)  Thus, Mehrabani-Farsi discloses a marketing method.  Dr. Taylor agrees, and Mr. Hussmann does not dispute, that Mehrabani-Farsi discloses a marketing method.  (PFF ¶¶ 126-127.)  Thus, there can be no genuine dispute that Mehrabani-Farsi discloses this limitation.

#### ii.   "at a server system"

The Mehrabani-Farsi advertising method is implemented at a server system.  Specifically, Mehrabani-Farsi describes a "server system" made up of an "Ad Server," a "Voice and Speech Portal," and the "Internet."  (PFF ¶ 128.)



FIG. 1

This server system performs the method of claim 1. (PFF ¶ 128.) Moreover, Dr. Taylor agrees, and Mr. Hussmann does not dispute, that Mehrabani-Farsi discloses a "server system." (PFF ¶¶ 129-130.) Thus, there can be no genuine dispute that Mehrabani-Farsi discloses this limitation.

### iii. "receiving from a mobile wireless communications device a wireless call or message"

Mehrabani-Farsi discloses that the remote server system that implements the advertising method receives wireless calls and messages from a mobile wireless communications device. Specifically, Mehrabani-Farsi discloses "[a] targeted customer may use his mobile phone to call a toll-free number and request services. . . . The interaction by a consumer and system 10 starts by the consumer dialing a toll-free number or a quick-dial number of the mobile phone" to initiate the disclosed advertising method." (PFF ¶ 116.) The server system then receives further wireless calls or messages as the user interacts with the system to get more information regarding the items and shopping locations in which he is interested. (PFF ¶¶ 117-118, 131-132.) Dr. Taylor agrees that Mehrabani-Farsi discloses that the server system receives a wireless call or message that initiates the remainder of the method. (PFF ¶ 133.)

Although Mr. Hussmann disputed in his expert report that Mehrabani-Farsi discloses the server system receiving a wireless call or message that initiated the method, Mr. Hussmann admitted at his deposition the limitation was disclosed:

> Q.    But the Mehrabani-Farsi patent discloses receiving from a mobile wireless communications device a wireless call or message, right?
>
> A. It does

(PFF ¶ 134.)  Accordingly, there can be no genuine dispute that Mehrabani-Farsi discloses this limitation.

### iv.    "determining that said mobile wireless communications device is located at a given shopping facility"

Mehrabani-Farsi discloses a method of determining that the mobile device is located at a given mall.  Specifically, Mehrabani-Farsi discloses that:

> As the availability of location information of mobile phones becomes more widespread in the domestic market, potential customers who have established a profile will automatically receive advertisement on their phones that match and conform to the customer's profiles, without having to initiate calls to the service. One attribute of when data is sent to a consumer is a range specified by the retailer (from three feet to many miles). This transmission of advertisements to a consumer may occur only when the consumer is within a specified boundary.

(PFF ¶ 113.)  Dr. Taylor agrees that the limitation is disclosed.  (PFF ¶ 135.)  Mr. Hussmann's distinction that the "located at" limitation is performed "without receiving a wireless call or message at a server system" is not credible – the automatic location determination techniques described in Mehrabani-Farsi send wireless calls or messages to the server system in order to determine the device's location.  (PFF ¶ 114.)  Moreover, these messages to the server indicating that the user "is within a specified boundary" initiate the Mehrabani-Farsi advertising method. (PFF ¶¶ 113-114, 135.)

Mr. Hussman's distinction here requires one to read in a limitation to claims 1 and 19. Based on his report, Mr. Hussmann's opinion appears to be that the "located at" limitation is not met because the first wireless call or message sent to the Mehrabani-Farsi server system is not a wireless call or message that allows the server system to determine that the mobile device is located at a mall. (PFF ¶ 138.) But all that the claim requires is that the server receive a wireless call or message, then determine that the mobile device is located at a shopping facility. (PFF ¶¶ 28, 33.) Which Mr. Hussmann did not deny is disclosed in his deposition.[3] Thus, there can be no genuine dispute that Mehrabani-Farsi discloses this limitation.

Moreover, Mehrabani-Farsi discloses that the server system receives a wireless call or message from a mobile device user when that user selects a mall from a list of malls and conveys this selection to the server system via a wireless call or message. (PFF ¶¶ 119-121, 131-132, 138.) Specifically, "at 210 the IVR system prompts the user to identify a location of interest. In one embodiment, *a location may be a mall location* or a store location . . . . [A]t step 215, *a determination is made whether the user had, at this point, provided the IVR system with a valid location.* . . . If . . . at 215, the user had provided the user with a meaningful location to contemplate a purchase transaction, then at 217 an advertisement search is conducted. . . . If an excessive number of matches are found for a given request, the customer is given an option to narrow the possibilities . . . . *If the consumer specified a mall* but not a specific store, *then the consumer is given the choice to select from found stores within that mall*." (PFF ¶¶ 132, 136.)

In the context of infringement, NMT alleges that when The Club mobile app server system receives an indication of the user's selection of a particular mall of interest from a list and

---

[3] Moreover, for infringement, Mr. Hussman points to the second HTTP GET request as the wireless call or message that meets this limitation, not the first HTTP GET request sent to the server system when the Club Mobile App is launched. (PFF ¶¶ 230, 238.) Thus, Mr. Hussman did not apply this requirement during his infringement analysis.

processes that indication to return mall-specific information to the user's mobile device, the server system is determining that the mobile device is located at a particular mall. (PFF ¶ 250.) NMT cannot, like a "nose of wax," interpret the claim one way in the context of infringement and now another way in the context of validity. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) (quoting *Sterner Lighting, Inc. v. Allied Elec. Supply, Inc.*, 431 F.2d 539, 544 (5th Cir. 1970) ("A patent may not, like a 'nose of wax,' be twisted one way to avoid anticipation and another to find infringement.")).

> **v.  "correlating a menu of choices specific to said given shopping facility with said given shopping facility"**

Mehrabani-Farsi discloses that once the mall has been selected, the server system will identify a list of stores at that mall that are selling the items of interest to the user. (PFF ¶¶ 119-121, 131-132.) Specifically, "if the consumer specified a mall but not a specific store, then the consumer is given the choice to select from found stores within that mall." (PFF ¶ 132.) Dr. Taylor agrees, and Mr. Hussmann does not dispute, that Mehrabani-Farsi discloses this limitation. (PFF ¶¶ 141-142.) There can be no genuine dispute that Mehrabani-Farsi discloses this limitation.

> **vi.  "responsive to said receiving, returning to said wireless communications device information to provision said wireless communications device with said menu of choices"**

Mehrabani-Farsi discloses that after the user selects a mall, the server system provides the user with a menu by providing a list of stores that sell the item of interest.

> 10. A method as defined in claim 1, wherein prompting comprises:
> transmitting a wireless communication to the sender, the wireless communication comprising an audibly discernable list of shopping centers; and
> ***receiving a selection of a shopping center from the sender***.
> 12. A method as defined in claim 10, further comprising:

*transmitting to the sender an audibly discernable list of stores in a shopping center* selected by the sender and

receiving a store selection from the sender.  (PFF ¶¶ 119-121, 131-132.)

Dr. Taylor agrees, and Mr. Hussmann does not dispute, that Mehrabani-Farsi discloses that the server system returns to said wireless communications device information to provision said wireless communications device with said menu of choices.  (PFF ¶¶ 143-144.)  Thus, there can be no genuine dispute that Mehrabani-Farsi discloses this limitation.

> **vii.    "subsequent to said returning said information, on receiving from said wireless communications device a choice selected from said menu, returning to said wireless communications device one or more text-based marketing messages, at least one of said text-based marketing messages comprising a marketing incentive particular to a store in said given shopping facility."**

Mehrabani-Farsi discloses that the user can select a store from the list of stores at a mall.  (PFF ¶¶ 121-122, 145-146.)  Upon receiving this selection, the server system will return advertising information, such as a coupon, specific to that store within the mall.  *Id.*  "In one embodiment, the coupon may assume the form of a text message."  (PFF ¶¶ 145-146.)



(PFF ¶ 146.)

Dr. Taylor agrees, and Mr. Hussmann does not dispute, that Mehrabani-Farsi discloses that the server system of Mehrabani-Farsi, subsequent to said returning said information, on receiving from said wireless communications device a choice selected from said menu, returning to said wireless communications device one or more text-based marketing messages, at least one of said text-based marketing messages comprising a marketing incentive particular to a store in said given shopping facility.  (PFF ¶ 147-148.)  Thus, there can be no genuine dispute that Mehrabani-Farsi discloses this limitation.

> **viii.  "The method of claim 1 wherein said receiving from a wireless device a wireless call or message comprises receiving said call or message with an associated geographic indication." (Claim 3)**

Mehrabani-Farsi discloses that "[a]s the availability of location information of mobile phones becomes more widespread in the domestic market, potential customers who have established a profile will automatically receive advertisement on their phones . . . . [T]ransmission of advertisements to a consumer may occur only when the consumer is detected within a specified boundary."  (PFF ¶ 113.)  Thus, Mehrabani-Farsi discloses that the disclosed marketing method will be initiated when a wireless call or message may be sent to the server system with a geographic indication that the user is within a specified boundary.  (PFF ¶¶ 150-151.)  Based on the disclosure in Mehrabani-Farsi of providing mall-specific information, this specified boundary may be within a shopping mall.  (PFF ¶ 150.)

Moreover, Dr. Taylor agrees that Mehrabani-Farsi discloses this limitation.  (PFF ¶ 151.)  Mr. Hussmann provides no specific opinion regarding the Mehrabani-Farsi disclosure of claim 3, other than to say that it is not anticipated because it depends from claim 1.  (PFF ¶ 152.)  Thus, there can be no genuine dispute that Mehrabani-Farsi discloses the limitation of claim 3.

> **ix.  "The method of claim 1 wherein said menu is a further menu and said choice is a further**

**choice and wherein said returning returns information to provision said wireless communications device with a first menu and, upon selection of a first choice from said first menu, with said further menu." (Claim 17)**

Mehrabani-Farsi discloses that the server system may return a first menu and, upon receiving a choice from the first menu, a further menu. Specifically, Mehrabani-Farsi discloses the following set of claims that comprise a first menu and upon selection of a first choice from the first menu, a further menu:

> 1. A method of promoting merchandise, the method comprising:
> Receiving a communication from a sender
> Prompting the sender to specify merchandise of interest to the sender; and
> Transmitting a communication to the sender, wherein the wireless communication comprises an advertisement that is related to the merchandise of interest.
> 10. A method as defined in claim 1, wherein prompting comprises:
> transmitting a wireless communication to the sender, the wireless communication comprises an audibly discernable list of shopping centers; and
> receiving a selection of a shopping center from the sender.
> 12. A method as defined in claim 10, further comprising:
> transmitting to the sender an audibly discernible list of stores in a shopping center selected by the sender; and
> receiving a store selection from the sender.
> 14. A method as defined in claim 12, further comprising:
> transmitting to the sender an audibly discernible list of merchandise in a store selected by the sender; and
> receiving a merchandise selection from the sender.
> 15. A method as defined in claim 14, further comprising: transmitting to the sender an advertisement applicable to merchandise selected by the sender.
> (PFF ¶¶ 119-124.)

Thus, Mehrabani-Farsi discloses that, upon selecting a particular shopping center, the server system sends a first menu comprising a list of stores. (PFF ¶¶119-120.) Upon selection of a store, the server system sends a list of merchandise from which the user may make a further selection. (PFF ¶¶ 121-122.)

Dr. Taylor agrees that Mehrabani-Farsi discloses this limitation. (PFF ¶ 153.) Mr. Hussmann provides no specific opinion regarding the Mehrabani-Farsi disclosure of claim 17,

other than to say that it is not anticipated because it depends from claim 1. (PFF ¶ 154.) Thus, there can be no genuine dispute that Mehrabani-Farsi discloses the limitation of claim 17.

> **b.      Mehrabani-Farsi Discloses Each and Every Element of Independent Claim 19 of the '130 Patent**

NMT's expert's validity analysis for independent claims 1 and 19 is not materially different. When asked at his deposition, NMT's expert agreed that his validity analysis with respect to the independent claims 1 and 19 was the same. (PFF ¶ 155.) Accordingly, the analysis below for claim 19 is not materially different than the analysis for claim 1, as indicated.

> **i.      "A computer readable medium containing computer executable instructions which, when executed by a processor of a server cause said server to"**

The wireless advertising method disclosed in Mehrabani-Farsi can be implemented on computer readable medium containing computer executable instructions that are executed by a processor of the server, as required by claim 19. Specifically, Mehrabani-Farsi describes a "server system" made up of an "Ad Server," a "Voice and Speech Portal," and the "Internet." (PFF ¶ 128.) In addition, the server included computer executable instructions that, as described below, caused the processor of the server to perform the steps of the disclosed method. "In particular, retailers, or their authorized employees or agents, may operate personal computers 113 to obtain access, through the Internet, for example, to a server system 12." (PFF ¶ 156.) Moreover, claims 31-34 disclose and claim "[a]n article comprising a machine-readable storage medium that comprises instructions that, if executed, enable a system to" perform specified steps. (PFF ¶¶ 157-161.)

Dr. Taylor agrees, and Mr. Hussmann does not dispute, that Mehrabani-Farsi discloses a "computer readable medium containing computer executable instruction that are executed by a

processor of a server." (PFF ¶¶ 162-163.) Thus, there can be no genuine dispute that Mehrabani-Farsi discloses this limitation.

> **ii.** **"on receiving from a mobile wireless communications device a wireless call or message"**

*See supra* Section IV.C.2.a.iii. (PFF ¶ 164.)

> **iii.** **"determining that said mobile wireless communications device is located at a given shopping facility"**

*See supra* Section IV.C.2.a.iv. (PFF ¶ 164.)

> **iv.** **"correlating a menu of choices specific to said given shopping facility with said given shopping facility"**

*See supra* Section IV.C.2.a.v. (PFF ¶ 164.)

> **v.** **"returning to said wireless communications device information to provision said wireless communications device with said menu of choices"**

*See supra* Section IV.C.2.a.vi. (PFF ¶ 164.)

> **vi.** **"subsequent to said returning said information, on receiving from said wireless communications de vice a choice selected from said menu, returning to said wireless communications device one or more text-based marketing messages, at least one of said text-based marketing messages comprising a marketing incentive particular to a store in said given shopping facility."**

*See supra* Section IV.C.2.a.vii. (PFF ¶ 165.)

## V. SUMMARY JUDGMENT OF NON-INFRINGEMENT

GGP is entitled to summary judgment of non-infringement as to both versions 1 and 2 of The Club Mobile App. First, although version 1 of The Club Mobile App was the only version that had been released as of the date NMT filed this case, NMT has not set forth any

evidence nor any specific contention in support of infringement of Version 1. As the party bearing the burden of proof on infringement, NMT's failure to put forth any proof is fatal to its infringement case.

Second, while NMT has contended that Version 2 of The Club Mobile App infringes, there is no genuine dispute that this version does not practice the step of "determining that said mobile wireless communications device is located at said given shopping facility."[4] The parties are in agreement that NMT can identify no functionality within The Club Mobile App that determines that a mobile device is physically present within, or close to a shopping mall. Instead, NMT has identified functionality that determines that a mobile wireless communications device is "associated with" a particular shopping mall. Under the plain meaning of the "located at" limitation, the functionality identified by NMT cannot literally infringe the "located at" limitation of the '130 patent. NMT does not have a claim for infringement under the doctrine of equivalents for the "located at" limitation, nor has NMT raised any genuine dispute that The Club Mobile App infringes this limitation under the doctrine of equivalents. GGP's motion for summary judgment of non-infringement should be granted.

### A. Legal Standards

The two-step patent infringement inquiry requires, first, the proper construction of the patent's claims and, second, a comparison of the properly construed claims to the accused product. *Telemac*, 247 F.3d at 1323. A patent claim is not infringed unless each and every limitation of the claim is found in the accused product, either literally or under the doctrine of equivalents. *Id.* Although both literal infringement and doctrine of equivalents are questions of fact, summary judgment of non-infringement is appropriate when, in light of the undisputed

---

[4] While there are additional reasons The Club Mobile App does not infringe the '130 patent, GGP moves for summary judgment on this one.

material facts, "no reasonable jury could find that every limitation recited in a properly construed claim [is] found in the accused device either literally or under the doctrine of equivalents." *Sunbeam Prods.*, 670 F. Supp. 2d at 884 (quoting *U.S. Philips Corp. v. Iwasaki Elec. Co.*, 505 F.3d 1371, 1374-75 (Fed. Cir. 2007) (internal citations and quotations omitted)).

**B. Version 1 of The Club Mobile App Does Not Infringe The '130 Patent.**

GGP is entitled to summary judgment that Version 1 of The Club Mobile App does not infringe the '130 patent because NMT has failed to put forth any evidence that Version 1 infringes the '130 patent. "Summary judgment must be granted against a party who has failed to introduce evidence sufficient to establish the existence of an essential element of that party's case, on which the party will bear the burden of proof at trial." *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Here, NMT has introduced no evidence that Version 1 of The Club Mobile App infringes the '130 patent. Indeed, Mr. Hussmann makes no mention of Version 1 in his infringement report; his opinion and analysis relies solely on his "black box" analysis of Version 2. (PFF ¶ 215.) This failure of proof is fatal to NMT's infringement case. *Computer Docking Station Corp. v. Dell, Inc.*, 2007 WL 5117465 at *8 (W.D. Wis. 2007) (citing *Celotex*, 477 U.S. at 333) (summary judgment of non-infringement granted where plaintiff failed to put forth any evidence that certain accused products infringed an element of the asserted claims).

Because NMT, not GGP, bears the burden of proof on the issue of infringement, GGP need not produce evidence showing the absence of a genuine dispute as to any material fact.[5]

---

[5] Regardless, in addition to not "determining that said mobile wireless communications device is located at a given shopping facility," The Club Mobile App Version 1 also does not include the Version 2 functionality that NMT points to for meeting the limitation "on receiving from said wireless communications device a choice selected from said menu, returning to said wireless communications device one or more text-based marketing messages." (PFF ¶ 211.)

*Celotex*, 477 U.S. at 325. Instead, GGP's burden is discharged by pointing out that there is an absence of evidence to support NMT's case. *See, e.g.*, *id.*; *Exigent Tech., Inc. v. Atrana Sols., Inc.*, 442 F.3d 1301, 1307-09 (Fed. Cir. 2006). The deadlines for expert reports on liability have long since passed. NMT cannot remedy this deficiency and, as such, GGP's motion for summary judgment of non-infringement for Version 1 of The Club Mobile App should be granted.

### C. The Club Mobile App Does Not Infringe The '130 Patent Because It Does Not "Determin[e] That Said Mobile Wireless Communications Device Is Located At A Given Shopping Facility"

GGP is entitled to summary judgment of non-infringement of the '130 patent because The Club Mobile App does not perform the step of "determining that said mobile wireless communications device is located at a given shopping facility," as required by claim 1, nor does it include "computer executable instructions" that accomplish "determining that said mobile wireless communications device is located at a given shopping facility," as required by claim 19. *General Electric Co. v. Int'l Trade Com'n*, 670 F.3d 1206, 1214 (Fed. Cir. 2007). ("For infringement, every element and limitation of a claim of the patent must be found in the accused device, literally or in accordance with the doctrine of equivalents."). Because claims 3 and 17 depend from claim 1, The Club Mobile App similarly does not infringe these claims. *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1359 (Fed. Cir. 2007). As a result, GGP is entitled to summary judgment of non-infringement of the '130 patent.

#### 1. The Club Mobile App does not literally infringe the "located at" limitation of the asserted '130 patent claims.

The Club Mobile App does not literally infringe the limitation "determining that said mobile communications device is located at a given shopping facility" under the Court's plain meaning construction of that term. A claim limitation is not literally infringed unless "the claim

as properly construed reads on the accused product or method." *Laitram Corp. v. Morehouse Industries, Inc.*, 143 F.3d 1456, 1461 (Fed. Cir. 1998). In this case, the "located at" limitation has been accorded its plain and ordinary meaning. (PFF ¶¶ 173-175.) This plain meaning requires that the accused device or method determine that the mobile device is physically present within or close to the mall. (PFF ¶ 177.) Moreover, the plain meaning of the "located at" limitation requires that this determination take place "at a server system" or as a result of "computer executable instructions . . . executed by a processor of a server." (PFF ¶¶ 177.) The accused functionality performed by the remote web servers that support The Club Mobile App does not, however, determine that a phone is physically present within or close to a mall. (PFF ¶¶ 253-256, 258.)

NMT accuses the remote web server's processing of the HTTP GET request /adws/v1/destination/<>/offers as meeting the "located at" limitation. (PFF ¶ 250.) The HTTP GET request that includes the venue id is the message that the user's mobile device sends to the server when the user selects a mall of choice. (PFF ¶ 249-250.) But in processing this HTTP GET request, the remote web servers that support The Club Mobile App do not make any determination that a mobile device is physically present within or close to a GGP mall. (PFF ¶ 258-260.) The venue id is not an indication of the user's mobile device's physical location at a GGP shopping mall. (PFF ¶ 256.) Indeed, the venue id does not include any information regarding the physical location of the mobile device. (PFF ¶¶ 255.) Instead, the venue id indicates the mall that the user has selected from a list of possible malls. (PFF ¶ 234-238.)

The user can select any participating GGP mall about which to receive information, regardless of the user's current physical proximity to that mall. (PFF ¶ 228.) A Club Mobile

App user in Madison, Wisconsin can select the Prince Kuhio Plaza mall in Hilo, Hawaii as his mall of interest, and that user will receive information regarding Prince Kuhio Plaza mall.  (*Id.*) If that user then travels to and is physically present within the Mayfair Mall in Milwaukee, Wisconsin and launches The Club Mobile App, that user will continue to receive information for the Prince Kuhio Plaza mall in Hawaii.  (PFF ¶¶ 245-246.)  In sum, there can be no genuine dispute that The Club Mobile App's remote web servers do not determine that a mobile communications device is located at a given GGP mall by processing an HTTP GET request that includes the venue id for that particular mall.

NMT cannot raise a genuine issue of material fact with regard to The Club Mobile App's alleged infringement of the "located at" limitation because NMT's expert has admitted that The Club Mobile App's web servers do not determine that a mobile device is physically present within or close to a given mall.  *Telemac*, 247 F.3d at 1330 ("Once the claims have been correctly construed to determine their scope, the claims must be compared to the accused device. To find literal infringement, each limitation of the claim must be present in the accused device. Any deviation from the claim precludes such a finding.") (internal citations omitted).

> Q.   Okay. So it's your opinion that The Club mobile app, in conjunction with the servers that it interacts with, makes a determination that the device that has The Club mobile app on it is located at a mall?
>
> Mr. Albridge: Objection to form.
>
> Q. Based on your analysis of the court's claim construction opinion in the Simon case; is that correct?
>
> A. It's my opinion that the server determines that a mobile wireless communications device is located at a facility.
>
> Q. And how does the server make that determination?
>
> A. Given a unique venue ID, the server returns specific information given that venue ID.

Q. I think we established earlier, though, that when the user's phone or device communicates with the GGP Club app server, at no time does it send the device's physical location to the server, correct?

Mr. Albridge: Objection, form.

The Witness: It doesn't send a lat./long., right.

Q. Doesn't send any information about the actual physical location of the device to the server, correct?

Mr. Albridge: Objection to form.

The Witness: I don't believe.

(PFF ¶ 254.) Here, NMT's expert admits that The Club Mobile App's remote web servers do not determine a mobile device's location, including at a given GGP mall. Indeed, NMT's expert explicitly states that all the server is doing is associating a GGP shopping mall with a mobile device:

In my opinion, the process of associating a short code with a specific mall facility is no different than associating a venue id number with a specific facility. Thus, it is my opinion that *by associating* the venue id contained in the HTTP Get request with a given shopping facility, the server system is making a determination, that the mobile wireless communications device is located at that given shopping facility.

(PFF ¶ 194.) But this Court has rejected that interpretation of the claim language.

Nor do The Club Mobile App's web servers assume that the device is located at a mall when a user requests information regarding the mall. (PFF ¶ 258.) The Club Mobile App's product page on iTunes and Android Market explicitly states that the app can be used from home to plan a shopping trip. (PFF ¶ 257.) Thus, the server does not assume that the receipt of a request from the phone means that the phone is currently within or close to the mall. (PFF ¶ 258.) Under the plain and ordinary meaning of the "located at" limitation, this mere association cannot infringe. (PFF ¶¶ 170, 173-174.)

The specification and the prosecution history further support the conclusion that mere association of the mobile device and a GGP mall cannot infringe the "located at" limitation. The specification consistently describes a system and method that is intended to provide time-sensitive information to shoppers currently at a particular mall:

> For example, if a menu choice were 'Men's Wear,' a message may be returned from each participating Men's Wear store in the mall **providing their latest offerings, sales, and/or promotions to entice the user into their store.**

> The value to the shopper is tremendous; it is a sales aid reminding them of specific sales programs now underway, **alerting them to promotions that may not be advertised outside the mall**, it conveys time sensitive information, such as 'Happy Hour' Specials in restaurants and bars.

> The value to the retailer is even greater as the merchant now has the ability to **more actively, in real time, drive extremely qualified traffic to their store. The shopper is in the mall; at that moment** and wants to see what you have to offer . . . ." (PFF ¶ 178) (emphasis added).

The prosecution history similarly discredits NMT's theory that the "located at" limitation is infringed by a server system that merely associates a mobile device with a mall and makes no assumptions regarding the device's physical location. Time and again, the applicants amended claims and stressed the location-based nature of the claims. First, in response to an office action rejecting the claims as obvious over a patent that disclosed a system and method for using a mobile phone while at a stadium event (e.g. a sports game or concert) to purchase goods such as food, souvenirs, and future event tickets while remaining in his or her seat, the applicants emphasized the invention's purpose of providing time-sensitive marketing information to shoppers currently in the mall:

> Thus, in paragraph 63, Inselberg teaches "a user enters an order for ... a coupon redeemable for other items or for reduced prices". This is in contrast to claim 1 where a user does not enter an order for a coupon. **Instead, a user at a shopping facility initiates a wireless**

*call* and receives "a menu of choices particular to that shopping facility". The user makes a menu selection and then receives "a marketing incentive particular to a store in said shopping facility". ***This difference is crucial***: ***unlike Inselberg, with the method of claim 1, the marketing incentive particular to a store in the shopping facility returned in response to the user's menu choice acts as an enticement to induce the user to enter the store. So "the merchant now has the ability to more actively, in real time, drive <u>extremely qualified</u> traffic to their store. The shopper is <u>in the mall</u>; at that moment and wants to see what you have to offer"***. (See paragraph 17). In the words of an example given in the description: "if a menu choice were 'Men's Wear', a message may be returned from each participating Men's Wear store in the mall providing their latest . . . promotions to entice the user into their store." (See paragraph 12.) ***Therefore, the method of claim 1 has the result of drawing shoppers in a mall into a store in which they are interested.*** This is in contrast to Inselberg which has the result of enticing a user to order further goods while at his or her seat. The method of claim 1 gets a shopper into a store where s/he may purchase an item subject of the marketing incentive or any other item in the store. ***The method of Inselberg acts to entice a user to purchase only a specific item that is being promoted with a discount coupon and does not act to draw a user into a store.***" (PFF ¶¶ 180-182.)

Thus, the applicants differentiated their claims from the prior art on the basis that the prior art entices future purchases that are remote from the mobile device user's current location, whereas the applicants' invention entices users ***at the mall*** to change their shopping plans and enter different stores based on up-to-the-minute information regarding sales and special offers.

Additional amendments and responses to office actions made similar changes to focus on the "location based nature" of the claimed invention. (PFF ¶¶ 181-189.) Indeed, that the examiner allowed the claims only after the addition of the "located at" language further undercuts NMT's infringement allegations, which read out the location-based nature of the claimed invention. (PFF ¶¶ 189-191.)

> **2. NMT has failed to put forth evidence that The Club Mobile App infringes the "located at" limitation under the doctrine of equivalents.**

The Club Mobile App does not infringe the limitation "determining that said mobile communications device is located at a given shopping facility" under the doctrine of equivalents. To avoid summary judgment of non-infringement under the doctrine of equivalents, the patentee must present evidence of infringement under the doctrine through the testimony of one of skill in the art. *AquaTex Indus., Inc. v. Techniche Solutions*, 479 F.3d 1320, 1329 (Fed. Cir. 2007) ("[W]hen the patent holder relies on the doctrine of equivalents, as opposed to literal infringement, the difficulties and complexities of the doctrine require that evidence be presented to the jury or other fact-finder through the particularized testimony of a person of ordinary skill in the art, typically a qualified expert, who (on a limitation-by-limitation basis) describes the claim limitations and establishes that those skilled in the art would recognize the equivalents.") In this case, NMT's expert, Mr. Hussmann, has not offered an opinion regarding the alleged infringement of the "located at" limitation under the doctrine of equivalents with respect to claims 1 or 19. (PFF ¶ 199.) NMT has offered no evidence regarding the alleged infringement of the "located at" limitation under the doctrine of equivalents. Accordingly, summary judgment should be granted in favor of GGP that The Club Mobile App does not infringe the "located at" limitation under the doctrine of equivalents for claims 1 and 19. *See AquaTex*, 479 F.3d at 129 (affirming summary judgment of non-infringement under the doctrine of equivalents because, by failing to provide expert testimony regarding the doctrine of equivalents, patentee failed to raise a genuine issue of fact regarding infringement under the doctrine). Moreover, because claims 3 and 17 depend from claim 1, GGP cannot infringe claims 3 and 17 under the doctrine of equivalents. *Monsanto*, 503 F.3d at 1359.

> **3. Because GGP does not practice each and every limitation of the asserted independent claims, GGP is entitled to summary judgment of non-infringement as to all asserted claims.**

As shown above, The Club Mobile App does not include a server system that accomplishes "determining that said mobile wireless communications device is located at a given shopping facility" as required by claim 1. Nor does The Club Mobile App or its remote web servers include "computer executable instructions which, when executed by a processor of a server cause said server to . . . on receiving a wireless call or message from a mobile wireless communications device, determining that said mobile wireless communications device is located at a given shopping facility" as required by claim 19. Infringement of a method claim requires that the accused device practice each and every step of the claimed method, either literally or under the doctrine of equivalents. *Tanabe Selyaku Co. v. U.S. Intern. Trade Com'n*, 109 F.3d 726, 731 (Fed. Cir. 1997). Similarly, infringement of an apparatus claim requires that the accused device include each and every limitation of the asserted claim. *Id.* In this case, The Club Mobile App and its remote web servers do not practice the "located at" limitation of independent claims 1 and 19 of the '130 patent, either literally or under the doctrine of equivalents. As such, GGP cannot infringe these claims. Moreover, because claims 3 and 17 depend from claim 1, GGP cannot infringe these claims either. *Monsanto*, 503 F.3d at 1359 ("One who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that claim.") (quoting *Wahpeton Canvas Co., Inc. v. Frontier, Inc.*, 870 F.2d 1546, 1552 (Fed. Cir. 1989)). Accordingly, GGP respectfully requests that this Court grant its motion for summary judgment of non-infringement of claims 1, 3, 17, and 19 of the '130 patent.

Dated:  April 10, 2012

Respectfully submitted,

*s/ Mark. A. Pals, P.C.*
Mark A. Pals, P.C. (IL 6201751)
Eric D. Hayes, *pro hac vice*
Helena D. Kiepura, *pro hac vice*
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois  60654
Telephone: (312) 862-2000
*Attorneys for General Growth Properties*